UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DALLAS ROBERT MEDDAUGH,

        Plaintiff,        Civil Action No. 14-13131
                                Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**OPINION AND ORDER GRANTING THE COMMISSIONER'S
MOTION FOR SUMMARY JUDGMENT [24] AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [21]**

Plaintiff Dallas Robert Meddaugh ("Meddaugh") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties filed summary judgment motions [21, 24], and have consented to the undersigned conducting all proceedings in this action, including the entry of a final judgment, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. [32].

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Meddaugh is not disabled under the Act. Accordingly, the Commissioner's Motion for Summary Judgment [24] is GRANTED, Meddaugh's Motion for Summary Judgment [21] is DENIED, and, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision is AFFIRMED.

**II.     REPORT**

    **A.     Procedural History**

On June 20, 2011, Meddaugh filed an application for SSI, alleging a disability onset date of January 1, 2007. (Tr. 181-89). This application was denied initially on August 9, 2011. (Tr. 100-03). Meddaugh filed a timely request for an administrative hearing, which was held on January 9, 2013, before ALJ James Gramenos. (Tr. 31-90). Meddaugh, who was represented by attorney John Paterson, testified at the hearing, as did vocational expert Lois Brooks. (*Id.*). On March 15, 2013, the ALJ issued a written decision finding that Meddaugh is not disabled under the Act. (Tr. 14-27). On June 12, 2014, the Appeals Council denied review. (Tr. 1-5). Meddaugh timely filed for judicial review of the final decision on August 14, 2014. (Doc. #1).

    **B.     Framework for Disability Determinations**

Under the Act, SSI is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in

the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C. Background**

*1. Meddaugh's Reports and Testimony*

At the time of the administrative hearing, Meddaugh was 20 years old, and at 6'2" tall, weighed 158 pounds. (Tr. 48). He lived in a house with his girlfriend, their daughter, and his girlfriend's family. (Tr. 54, 210). He completed high school but has had no further education. (Tr. 40, 197). He has never held a job for longer than five months. (Tr. 49).

Meddaugh alleges disability as a result of complex partial seizures, with which he was first diagnosed at age 14. (Tr. 39, 196). He testified that, while in high school (up until June 2010), he experienced five seizures per month and was not permitted to play sports.[1] (Tr. 40). At the time of the hearing, he claimed he was continuing to experience two seizures per month. (Tr. 42). In various reports, and in his hearing testimony, Meddaugh also indicated that his

---

[1] At doctors' visits during this period of time, however, Meddaugh reported playing football and excelling at sports. (Tr. 484, 491, 493).

3

seizure medication (Lamictal) causes side effects such as dizziness, blurred vision, headaches, nausea, and hand tremors. (Tr. 48, 217, 236).

When asked how his seizure disorder limits his ability to work, Meddaugh stated:

> I am not allowed to work around grills, large machinary [sic], and I cannot drive. Resturants [sic] don't want me to wait tables, in case I have a seizure and drop the prepared food or dishes. I am also not allowed to work with anything sharp.

(Tr. 210). He testified that he attempted to work at a camp during the summer of 2012 (picking up leaves and garbage), through the Michigan Works Program, but "had seizures throughout the whole times [he] was working" and was "forced to stop" by his physician. (Tr. 42-43). According to Meddaugh, working outside, in the heat, put extra strain on his body, causing these seizures. (Tr. 43). Meddaugh further testified that he has been advised not to lift more than ten pounds because he could "injure or kill" himself or others if he has a seizure while doing so. (Tr. 44). He has difficulty using his hands because he has a tremor. (Tr. 215). In addition, he testified that he has difficulty concentrating and should not stare at computers, televisions, or video games for more than 60-90 minutes at a time. (Tr. 46).

Meddaugh has never had a driver's license because he is "not approved by [his] doctor to drive." (Tr. 36). He is able to care for his young daughter (change her diaper, feed her, play with her, put her to sleep, etc.). (Tr. 51-52, 63, 211). He has no difficulties with personal care and is able to prepare meals, perform housework (such as cleaning and laundry), shop in stores, and perform yard work. (Tr. 51, 63, 65, 211-13). He enjoys drawing, watching television, playing sports (though he indicated in a June 14, 2011 self-report that he has been unable to play sports since his condition began)[2], and likes to "just hang out" with others. (Tr. 214).

---

[2] In a July 15, 2011 report completed by Meddaugh's girlfriend, she wrote that Meddaugh "can not play sports besides just for fun with friends and family." (Tr. 229). She also indicated that

*2.     Medical Evidence*

On July 27, 2007, Meddaugh presented to the emergency room after a single syncope episode. (Tr. 367-70). Except for some mild anxiety, Meddaugh's objective exam findings (including a CT scan of his head and a chest x-ray) were all normal. (Tr. 367-73). On October 6, 2007, Meddaugh returned to the emergency room after experiencing a brief seizure. (Tr. 271-74). Again, his objective exam findings and a CT scan of his brain were normal. (Tr. 274-75).

Meddaugh began treatment at the Michigan Institute for Neurological Disorders ("MIND") in February 2008. At his initial examination, Dr. Eileen McCormick noted that Meddaugh had been diagnosed with epilepsy after experiencing five paroxysmal "events" between November 2006 and December 2007, but that Meddaugh had not experienced any further "spells" after starting to take Lamictal around late December 2007. (Tr. 492). His MRI and MRA of the brain, two EEGs, blood work, and echocardiogram were all within normal limits. (Tr. 493). Meddaugh and his father reported that his school performance had not declined, and he excelled in sports. (*Id.*). On examination, Meddaugh's mental status, cranial nerves, motor findings, sensory findings, and reflexes were all normal. (Tr. 494). Dr. McCormick concluded that Meddaugh had "normal growth and development to date with paroxysmal events …." (Tr. 495).

Meddaugh did not have another seizure until March 3, 2008 (Tr. 463) and then had only two seizures, in May 2008 and December 2008, though records related to both mention Meddaugh's noncompliance with medication (Tr. 441 ("States that he forgot to take his lamictal at least for today"), 490 ("most recent seizure may indeed be secondary to noncompliance with medication").

---

Meddaugh "likes sports, video games, [and] movies," and engages in those activities "every day." (*Id.*).

After December 2008, Meddaugh had no seizures for approximately eighteen months. (Tr. 248, 441). Throughout his junior year in high school, Meddaugh repeatedly reported that he did well in school, was able to focus and concentrate, and got his work done. (Tr. 486, 488). On January 30, 2009, and April 29, 2009, his objective exam findings were all normal, except for a mild tremor in his left hand. (Tr. 486, 488-89). At a follow-up visit to MIND in August 2009, Meddaugh's objective findings were completely normal, and he reported having recently started football practice. (Tr. 484-85).

Throughout his senior year of high school, Meddaugh reported that he was able to focus and pay attention, was doing well academically, and had no medication side effects. (Tr. 478, 480, 482). On March 15, 2010, Dr. McCormick and Nurse Practitioner Anne Marie Michon opined that Meddaugh's EEG was "much improved." (Tr. 478). On examination, Meddaugh had a "very slight" left hand tremor, but his rapid alternating hand movements were intact, and his gait and reflexes were within normal limits. (*Id.*).

On June 1, 2010, Meddaugh had a mild seizure. (Tr. 248). At a follow-up examination at MIND on June 3, 2010, Meddaugh admitted that he had failed to take three medication doses before this seizure. (Tr. 268). Meddaugh's general health was good at this visit, and his exam findings were all normal, except for a very slight left hand tremor. (Tr. 268-69).

On September 13, 2010, Dr. McCormick and NP Michon noted that Meddaugh had not had any seizures since June and was experiencing no side effects from his medication. (Tr. 266). They "encouraged him strongly to get back into some type of [] school program or try to look for some type of job," noting that he "might be working with his uncle at a heating and cooling company." (Tr. 267).

On November 4, 2010, Meddaugh had a "staring spell," but admitted that he had not

6

taken his medication the day before. (Tr. 471). After this November 2010 spell, Meddaugh was seizure-free for almost two years.[3] (Tr. 508).

On March 2, 2012, Meddaugh indicated that he planned to participate in job training through Michigan Works. (Tr. 467). Again, Meddaugh's general health was good, and he reported no medication side effects. (*Id.*). Except for dysmetria with a bilateral hand tremor, Meddaugh had all normal exam findings, including a normal gait and full muscle strength. (*Id.*).

It was not until mid-2012 that Meddaugh had another seizure. (Tr. 508). On September 15, 2012, Dr. Susan Smietana and NP Michon noted that he had recently had two seizures, and they adjusted his medication. (*Id.*). Dr. Smietana and NP Michon opined that, "He cannot work around power tools, industrial cleaners, deep fryers or cooking grills or other hot stoves, and he cannot be climbing on ladders and/or be off the ground." (*Id.*). Aside from these restrictions, however, they indicated: "We have no difficulty allowing him to work as long as this information is taken into consideration to help promote his safety and prevent him from incurring injury should a seizure occur." (*Id.*).

On December 18, 2012, NP Michon opined that Meddaugh's impairment does not affect his standing, walking, sitting, reaching, handling, feeling, pushing/pulling, seeing, hearing, or speaking. (Tr. 514-15). She further opined that Meddaugh can work a full eight-hour day, does not need any substantial amount of rest that would prevent him from working, and that his pain is a 1/10 on the pain scale. (Tr. 516). NP Michon opined that Meddaugh can lift under ten pounds 1/4 to 1/3 of an eight-hour day; can stoop crouch, kneel, and crawl as tolerated; can never climb, be off the ground, or balance with more than ten pounds in his hand; cannot work with power

---

[3] At a March 28, 2011 exam, Meddaugh said he had experienced episodes where he would get a dazed look in his eyes, but he explained that he had not been sleeping well because he had a new baby. (Tr. 471). His objective exam findings were all normal at this visit, except for a slight hand tremor, greater on the left than the right. (*Id.*).

7

tools; and is restricted from heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, vibration, cooking grills, and grease. (Tr. 514-16).

### 3. Vocational Expert's Testimony

Lois Brooks testified as an independent vocational expert ("VE") at the administrative hearing. (Tr. 76-89). The ALJ asked the VE to imagine a hypothetical individual of Meddaugh's age, education, and work experience with the vocational profile described *infra* at 8-9. (Tr. 78-81). The VE testified that the hypothetical individual would be capable of working in the jobs of document preparer (3,200 jobs in southeast Michigan), order clerk (1,200 jobs), and surveillance system monitor (500 jobs). (Tr. 82-83).

Upon further questioning by Meddaugh's attorney, the VE testified that she could not answer the question of whether an individual who experiences one or two grand mal epileptic seizures per week without advance warning would be employable. (Tr. 85-86). She further testified that such a condition would be work preclusive if the individual could work only two to four hours per day, three days per week. (Tr. 86). Additionally, the VE testified that it also would be job preclusive if the hypothetical individual could concentrate for no more than one hour at a time, after which he would be unable to concentrate for two hours. (*Id.*).

### D. The ALJ's Findings

The ALJ first found that Meddaugh had not attained age 22 as of January 1, 2007, his alleged onset date. (Tr. 16). At Step One of the five-step sequential analysis, the ALJ found that Meddaugh has not engaged in substantial gainful activity since January 1, 2007 (the alleged onset date). (Tr. 17). At Step Two, the ALJ found that Meddaugh has the severe impairment of partial complex epilepsy. (*Id.*). At Step Three, the ALJ found that Meddaugh's impairments,

whether considered alone or in combination, do not meet or medically equal a listed impairment. (*Id.*).

The ALJ then found that Meddaugh retains the residual functional capacity ("RFC") to perform sedentary work with the following limitations:

> (1) [a]ble to occasionally lift and/or carry weights, defined as up to 1/3rd of the normal 8 hour work period at least up to 5 pounds of weight; (2) able to frequently lift and or carry weights, defined as up to 2/3rds of the work period, up to at least 5 pounds of weight; (3) able to engage in the positions of standing and/or walking in the work place, assuming normal periods of breaks, for an overall total of up to at least 6 hours during a normal 8 hour work period; (4) assuming normal breaks in any work setting, during any normal 8 hour work period, has the functional abilities to engage in sitting positions for periods of time of at least an overall period of 6 hours when performing work activity; (5) eliminate from consideration jobs that would have extremes of cold or heat; extremes of wetness and/or humidity; (6) requires a work environment that does not allow for an exposure to high levels of dusts, fumes, gases, or similar environmental conditions such as would exist in occupations such as farmer, road construction worker or welder; (7) eliminate jobs and claimant's presence in work around deep fryers, cooking grills or other hot devices including cooking stoves; (8) eliminate jobs that have a noise intensity level above the moderate level of noise intensity as that term "noise" is defined in the publications entitled Selected Characteristics of Occupations, and the Revised Dictionary of Occupational Titles [SOC]; (9) SOC defines <u>moderate noise intensity</u> as the noise intensity level in places such as a business office, department store, grocery store and similar places of business; (10) has the functional ability to engage in unskilled work activity that does not require exposure to high levels of stress; (11) I define <u>high levels of stress</u> such as would be expected in jobs that require working in-person with the general public, or as a team member performing work at an actual moving assembly line job, and not a bench assembly type job; and (12) eliminate from consideration jobs that have unprotected hazards in any work-setting from unprotected areas of moving machinery, heights, ramps, ladders, scaffolding and similar areas of danger.

(Tr. 18).

At Step Four, the ALJ determined that Meddaugh has no past relevant work. (Tr. 24). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Meddaugh is capable of

9

performing a significant number of jobs that exist in the national economy. (Tr. 25-27). As a result, the ALJ concluded that Meddaugh is not disabled under the Act. (Tr. 27).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may

look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

**F.     Analysis**

In his motion for summary judgment, Meddaugh argues that the ALJ erred in failing to adequately assess the credibility of his subjective complaints and, as a result, in determining his RFC. (Doc. #21 at 9-13). The Court disagrees.

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. *Soc. Sec. Rul.* 96-7, 1996 WL 374186, *1 (July 2, 1996); *see also* 20 C.F.R. §416.929.

In this case, after finding at Step Two that Meddaugh suffers from the severe impairment of partial complex epilepsy (Tr. 17), the ALJ concluded that he nevertheless retains the residual functional capacity to perform a reduced range of sedentary work (Tr. 18-24). In reaching this conclusion, the ALJ specifically referenced Meddaugh's testimony that he cannot work because he suffers grand mal seizures twice a month, without warning, and experiences dizziness, drowsiness, and hand tremors as a result of the medication he takes. (Tr. 19). However, the ALJ found that while Meddaugh's condition could reasonably be expected to produce the alleged symptoms, his statements about the intensity, persistence and limiting effects of those symptoms were not entirely credible to the extent they conflicted with the RFC assessment. (Tr. 20-24). In reaching this conclusion, the ALJ specifically considered Meddaugh's activities of daily living, prior statements and reports contained in the record, the objective medical evidence, and Meddaugh's lack of adherence to prescribed treatment, and he gave good reasons for discrediting Meddaugh's allegations of work-preclusive limitations. (*Id.*).

12

As an initial matter, the ALJ properly considered the objective medical evidence when evaluating Meddaugh's credibility. Specifically, the ALJ noted that the treatment notes in the record "significantly contradict" Meddaugh's testimony that he suffers from two seizures per month. (Tr. 24). Indeed, the evidence indicates that Meddaugh's seizures are, for the most part, well-controlled with medication. After he began treatment at MIND in February 2008, he suffered only four seizures, each of which was attributed to his noncompliance with treatment[4] or to sleep deprivation stemming from having a new baby. (Tr. 23-24 (citing Tr. 441, 471, 490, 508)). Between 2008 and 2012, Meddaugh twice went extended periods of time – once approximately eighteen months, and again almost two years – without any seizures whatsoever.[5] (Tr. 248, 441, 508). And, as the ALJ noted, the record does not evidence the significantly limited ability to focus, concentrate, or learn; evidence of brain damage; history of physical injuries; or neurological deficits that are typically associated with intense and disabling seizure activity. (Tr. 23). Such objective evidence is a "useful indicator" for an ALJ to use when evaluating the credibility of a claimant's symptoms. *See* 20 C.F.R. §416.929(c)(2) ("Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions

---

[4] The ALJ also considered Meddaugh's "lack of adherence to prescribed treatment" in concluding that his symptoms "may not be as severe as alleged." (Tr. 24). This is a proper consideration. *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (concluding that the ALJ properly discounted the claimant's credibility where he failed to follow prescribed treatment); *Soc. Sec. Rul. 96-7p*, 1996 WL 374186, at *8 (noting that "the individual's statements may be less credible if … the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").

[5] In his reply brief, Meddaugh asserts that he was not "completely seizure free for almost two years" because "EEGs show[ed] seizures appearing within the testing and the potential of the seizures continuing …." (Doc. #27 at 8-9). Meddaugh is correct – and the ALJ acknowledged – that EEGs performed between November 2010 and September 2012 showed some sub-clinical seizure activity. (Tr. 21). However, throughout this entire period of time, Dr. McCormick and NP Michon continued to note "no overt signs or symptoms of seizures." (Tr. 467).

13

about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.").

In addition, in assessing the credibility of Meddaugh's allegations, the ALJ noted that, despite his allegations of disabling symptoms, he engages in extensive daily activities. Specifically, the ALJ noted that Meddaugh's daily activities include playing sports for fun,[6] attending to his personal needs, caring for his young daughter, preparing meals, grocery shopping, walking, picking up the yard, doing laundry, playing video games, watching movies and television, cleaning, interacting with others, managing his financial affairs, and attending appointments. (Tr. 24, 51-52, 63, 65, 211-14). Moreover, as the ALJ noted, Meddaugh repeatedly reported that he was doing well in school and was able to concentrate. (Tr. 24, 478, 480, 482, 486, 488, 493). It was entirely appropriate for the ALJ to consider the fact that Meddaugh's ability to perform daily activities is less limited than one would expect, given his allegations of disabling symptoms. *See Walters*, 127 F.3d at 532 (an ALJ may consider household and social activities in evaluating the credibility of the claimant's allegations of disabling symptoms).

Finally, in evaluating Meddaugh's credibility the ALJ noted that there were inconsistencies between his hearing testimony and both his and his girlfriend's prior statements. (Tr. 24). For example, the ALJ noted that Meddaugh testified that he was prohibited from playing contact sports (Tr. 24, 65), but the treatment notes contain no such restriction. Indeed, as the ALJ noted, Meddaugh reported to Dr. McCormick and NP Michon that he played hockey and

---

[6] As noted above, *supra* at 4, Meddaugh's assertion that he could no longer play sports in light of his condition is contradicted by his girlfriend's virtually contemporaneous assertion that he still plays sports, albeit "just for fun." (Tr. 229). Even if Meddaugh can no longer engage in competitive athletics, his ability to play sports "just for fun" is still inconsistent with the extent of disability he alleges.

14

football in high school. (Tr. 24, 445, 484). In addition, while Meddaugh testified at the hearing that his medication causes side effects such as dizziness, blurred vision, and headaches (Tr. 48), treatment notes indicate that he routinely denied such side effects (Tr. 266, 467, 478, 480, 482, 486, 488). Again, the inconsistencies between these statements were appropriate considerations in evaluating Meddaugh's credibility. *See Hairston v. Comm'r of Soc. Sec.*, 2015 WL 4633935, at *7 (E.D. Mich. Aug. 3, 2015) (factors relevant to credibility include "the consistency of the claimant's statements, both internally and with other information in the record").

In sum, the ALJ recognized the duty imposed upon him by the regulations and, contrary to Meddaugh's assertions, did far more than merely rely "upon a preconceived notion that [he] lacked credibility …." (Doc. #21 at 11). Rather, in assessing Meddaugh's credibility, the ALJ properly considered his activities of daily living, prior statements and reports, the objective medical evidence, and his lack of adherence to prescribed treatment. Thus, the ALJ's credibility determination is supported by substantial evidence and should not be disturbed.

In addition to challenging the ALJ's credibility determination, Meddaugh also vaguely disputes the ALJ's conclusion that he retains the RFC to perform a reduced range of sedentary work. (Doc. #21 at 10-12). But, the ALJ's RFC finding is supported by the various pieces of medical evidence discussed above, including: (1) evidence that, since beginning treatment in February 2008, Meddaugh has suffered only four seizures, each of which was attributed to his noncompliance with treatment (Tr. 441, 471, 490, 508); (2) evidence that, between 2008 and 2012, Meddaugh twice went extended periods of time – once approximately eighteen months, and again almost two years – without any seizures whatsoever (Tr. 248, 441, 508); (3) evidence that, on examination, Meddaugh's mental status, cranial nerves, motor findings, sensory findings, and reflexes were consistently normal, with the exception of a mild tremor in his left

15

hand[7] (Tr. 268-69, 467, 478, 484-86, 488-89, 494); and (4) evidence that Meddaugh's treating practitioners believed him capable of working (and, indeed, encouraged him to do so) (Tr. 267, 508, 514-16). Meddaugh does not point to any specific medical evidence in challenging the ALJ's RFC finding, nor does he explain what additional limitations should have been imposed. For all of these reasons, the ALJ's RFC finding is supported by substantial evidence.[8]

Meddaugh briefly raises two other arguments, neither of which have merit. First, he argues that he should be found disabled based on a speculative concern that employers "will be reluctant to hire an individual with a seizure disorder." (Doc. #21 at 11). The Sixth Circuit, however, has long held that "the Secretary does not consider employability when determining whether a claimant qualifies as disabled." *Odle v. Sec'y of Health & Human Servs.*, 788 F.2d 1158, 1161 (6th Cir. 1985) (citing 20 C.F.R. §404.1566(c)(3)[9]). And, in his reply brief, Meddaugh suggests that he cannot obtain any of the jobs identified by the VE (order clerk, document preparer, or surveillance system monitor) because the "Michigan Secretary of State

---

[7] Without specifying any error on the part of the ALJ, Meddaugh asserts in his brief that he "is already experiencing hand tremors." (Doc. #21 at 10). This fact is not in dispute, however. Citing to Meddaugh's testimony, treatment notes, treating physician's opinion, and various reports, the ALJ found that Meddaugh's hand tremor has only a minimal effect on his ability to do basic work activities and, thus, is not a severe impairment. (Tr. 17 (citing Tr. 210-17, 225-32, 264, 434-35, 514-16)). Substantial evidence supports this finding: in particular, NP Michon opined that Meddaugh has no limitations in reaching, handling, feeling, pushing, or pulling. (Tr. 515).

[8] At one point in his motion, Meddaugh notes that the VE could not answer whether one to two seizures without warning per week would present an employability issue, and testified that it would be work-preclusive if an individual would require a two-hour break after one hour of concentration. (Doc. #21 at 10 (citing Tr. 86-88)). Apparently, Meddaugh believes the ALJ should have included these self-reported limitations in the RFC and found him disabled. (*Id.*). But, nothing supports these limitations, aside from Meddaugh's own testimony, which the ALJ properly found not credible. Thus, this argument is without merit.

[9] This statute provides, in pertinent part, "We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of … (1) Your inability to get work;…(3) The hiring practices of employers; … (7) You would not actually be hired to do work you could otherwise do…").

16

has denied him a driver's license as a result of his medical condition and he lives in a rural town at least two (2) hours from a major city." (Doc. #27 at 4). Again, however, this argument is at odds with the applicable regulations, which focus on the number of jobs available in the regional economy, regardless of the unavailability of work "in the immediate area" in which the claimant lives. 20 C.F.R. §404.1566(a)(1).

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

### III. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Commissioner's Motion for Summary Judgment **[24]** is **GRANTED**, Meddaugh's Motion for Summary Judgment **[21]** is **DENIED**, and the ALJ's decision is **AFFIRMED**.

Dated: December 4, 2015          s/David R. Grand
Ann Arbor, Michigan              DAVID R. GRAND
                                 United States Magistrate Judge


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 4, 2015.

                                 s/Eddrey O. Butts
                                 EDDREY O. BUTTS
                                 Case Manager